**In the United States District Court
for the District of Kansas**

———————

No. 19-cv-02420-TC

———————

DEBORAH ACOSTA,

*Plaintiff*

v.

ALLEGION, PLC,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Deborah Acosta is a former customer service representative for Allegion, PLC. She claims that after over ten years with the company, she was fired because of her age. Allegion moved for summary judgment. Doc. 33. For the following reasons, Allegion's motion is granted.

# I

## A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court

views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

**1.** Allegion makes and sells locks—traditional locks, keypad locks, and electronic locks that can integrate with phones. In recent years, the locks have become more computerized. Doc. 34 at ¶ 11. These newer locks are compatible with the internet, cell phones, and Wi-Fi-related devices. *Id.* at ¶ 12.

Acosta worked as an Allegion customer service representative for over ten years. Representatives field calls and emails from people who need help setting up and troubleshooting their locks. Doc. 32 at ¶ 2.a.i. This help can range from technical support to warranty coverage to general product information. Doc. 34 at ¶ 9. Naturally, the representatives must be familiar with the locks to efficiently resolve customer issues. *Id.* at ¶ 13. They must know the terminology associated with each product, its functionality, how to operate it, and how to resolve technological or hardware issues. *Id.* at ¶ 14.

Corresponding to its different lock styles, Allegion maintained several different call and email "queues." Doc. 34 at ¶ 18. When a new customer inquiry came into a queue, those representatives had to diagnose the issue, determine an efficient and appropriate resolution, and communicate that resolution to the customer. *Id.* at ¶ 10. Allegion tracked performance metrics across the queues and monitored customer calls. *Id.* at ¶¶ 15, 17; Doc. 38 at ¶ 3. It assigned representatives to the different queues based on their demonstrated product

knowledge. Doc. 34 at 19. Beginning in 2018, all representatives had to be qualified to work all queues. *Id.* at ¶ 20.

Acosta's performance issues began in 2016. She, like all customer service representatives, was required to respond to calls and emails as quickly as possible. *Id.* at ¶ 16. Her year-end reviews for 2016 and 2017 documented several quality and efficiency problems. Doc. 32 at ¶ 2.a.ii; *see* Doc. 34-1 at 13, 91–95. At the time, she acknowledged that she "Fell Short" in several performance areas, like "Customer Facing Time," "Schedule Adherence," "Selecting Disposition Percentage," and "WOW Points." Doc. 34-1 at 91–95. Among her process failures were forgetting to enter a "reason for the call" after customer conversations, Doc. 34-1 at 13; continuing to work after clocking out even though she was told not to, *id.* at 19–20; *see also* Doc. 34 at ¶ 35; and struggling to keep up with emails, Doc. 34-1 at 20. Acosta admits these difficulties but alleges that she was assigned to more calls per hour than the representative working next to her, and that she was held to a higher productivity standard. Doc. 37 at ¶ 4; *id.* at 21–22. Allegion asserts that it held all customer service representatives to the same standards. Doc. 34-2 at ¶ 10.

In January 2017, Acosta's then-manager, Tiffani Oliver, prepared a "strategies for success" plan for Acosta—a precursor to a performance improvement plan. Doc. 34 at ¶¶ 28–29; *see* Doc. 34-1 at 168–78. But a new manager, Daniel Estrada, took over Acosta's team and did not implement the plan immediately. Doc. 34 at ¶ 27; Doc. 34-4 at 4. Instead, he waited to allow Acosta to demonstrate her work performance under his lead. Doc. 34 at ¶ 30; Doc. 37 at ¶ 7 (controverting in irrelevant part). By year end, Acosta had over 300 unanswered customer emails in her work queue. Doc. 34 at ¶ 31.

Given these ongoing issues, Estrada implemented the strategies for success plan in January 2018. Doc. 34 at ¶ 31. The plan detailed Acosta's quality and timeliness issues, as well as her need to be more organized and knowledgeable about the company's locks. Doc. 34 at ¶ 40; Doc. 34-1 at 79–89. The plan called for recurring meetings with Estrada, human resources personnel, and other management team members. Doc. 34 at ¶¶ 41–42. Allegion also began providing Acosta extensive additional training. Doc. 34 at ¶ 43. This included courses on particular locks, rewritten documentation meant to improve Acosta's understanding, dedicated one-on-one training, and side-by-side training where she listened to others' live calls. *Id.* at ¶ 45; *see* Doc. 34-1 at 86–87.

3

To help Acosta complete this additional training, on March 12, 2018, Estrada gave her a "glossary" of important terms and product information to study, like "Bluetooth," "Wi-Fi," "Android," and "Wireless router." Doc. 34 at ¶ 47; Doc. 34-1 at 53–54, 158. At her deposition, Acosta acknowledged that it was important to understand these terms to be able to answer customer questions. Doc. 34 at ¶ 49; Doc. 34-1 at 53–57. Of the nine terms, she only knew about three at the time and lacked basic knowledge of the rest because she "didn't have this type of lock." Doc. 34-1 at 56–57; Doc. 34 at ¶ 48.

Acosta disputes Estrada's purported reason for assigning her the terms. She alleges that by giving her a list of terms to look up and learn, Estrada singled her out among employees. Doc. 37 at ¶¶ P2–P3. She was the oldest person both on her team and in her department, at age 61. Doc. 37 at ¶ P1.[1] According to Acosta, when giving her the terms, Estrada remarked that he could "look at someone and tell whether or not they knew the terms." Doc. 37 at ¶ P5 (controverted in irrelevant part); Doc. 34-1 at 28. Estrada, on the other hand, testified that he provided similar glossaries to others "prior to and after" Acosta. Doc. 34-2 at ¶ 22; Doc. 38 at ¶ III.2. Moreover, at some earlier time, Estrada told Acosta that she was slower than the "younger reps," before re-wording his comment to "newer reps." Doc. 37 at ¶¶ 21, P7; Doc. 34-1 at 40.

Later that day, after Estrada assigned the terms, Acosta submitted an anonymous complaint to Allegion's employee hotline. Doc. 34 at ¶ 63; Doc. 37-3. The complaint referred to the "younger reps" comment and the vocabulary terms assignment. Doc. 37 at ¶ P7. The complaint did not expressly mention discrimination, but Acosta alleges that Allegion plainly understood it as an age discrimination complaint based on how it handled the investigation. *Id.*; *see* Doc. 37-3 at 3. Likewise, though the complaint was submitted anonymously, Allegion understood that it came from Acosta. Doc. 37-3 at 3. And although Estrada denies knowing about the complaint before this lawsuit, Doc. 34-2 at ¶ 26, the record, viewed in Acosta's favor, indicates a genuine dispute about his awareness, *see* Doc. 37 at ¶ 8. Acosta also alleges that Estrada only "created" written documentation of the vocabulary terms after

---

[1] Allegion attempts to controvert this assertion as mere speculation because Acosta has not sought discovery or offered evidence of other employees' ages. Doc. 38 at ¶ III.1. But although Acosta testified that she did not know whether any coworkers were in their 40s or 50s, she did testify that most other employees were in their 20s and 30s and that, based on her personal knowledge and observation, she was the oldest. Doc. 38-1 at 3.

her complaint via a March 20 email memorializing the assignment. Doc. 37 at ¶ P6; Doc. 38 at ¶ III.6 (controverted in irrelevant part); *see* Doc. 34-1 at 160–61. She further alleges that human resources employee Juaquin Orosco wrote then that the test should be made standard practice for all employees. Doc. 37 at 21 (citing Doc. 34-1 at 163). Around that same time, Allegion's human resources investigator spoke with Estrada and Orosco about the complaint and "counseled [Estrada] to be careful in what he says and how he says things," given and how those things "can be perceived by people." Doc. 37-3 at 3; Doc. 37 at ¶ 22.

By May 2018, Acosta was still not working in all queues. Doc. 34 at 50. She was placed on a performance improvement plan (PIP), effective May 3. *Id.*; Doc. 34-5. The PIP focused on improving Acosta's skillset to qualify her for two particular queues. Doc. 34 at ¶¶ 51–52. Yet by July, Estrada noted only "slight improvement" and that Acosta still "continues to struggle with the technology aspect of her position." Doc. 34-1 at 180. He noted that she was "very unorganized" and "uncertain of the information she is giving," sometimes giving customers incorrect information altogether. *Id.* Lynette Fletcher, a lead over the integrated locks queues, Doc. 34-1 at 53, also noted only "some improvement" and that Acosta was "still struggling using her tools," *id.* at 181. Fletcher reported several instances where Acosta provided incorrect information to customers and left them on hold for several minutes. *Id.*

In short, despite the PIP, Acosta remained unable to efficiently handle calls in all queues. Doc. 34 at ¶ 60. Allegion asserts that "[a]ny customer service employee would have been discharged for similar performance issues." *Id.* at ¶ 61. Indeed, Estrada and other management eventually recommended that Allegion terminate Acosta's employment. Doc. 34 at ¶ 56; Doc. 34-4 at 3. She was fired on July 27, 2018. Doc. 32 at ¶ 2.a.iii.

**2.** After her termination, Acosta filed discrimination charges with the Equal Employment Opportunity Commission and the Kansas Human Rights Commission. Doc. 34 at ¶ 69; Doc. 34-3 at 5–9. The EEOC charge did not allege harassment or any specific age-based comments. Doc. 34 at ¶ 70. The EEOC dismissed the charge and issued a notice of right to sue. *Id.* at ¶ 71; Doc. 34-3 at 8–9. Acosta filed this suit, claiming that Allegion engaged in unlawful discrimination and

5

retaliation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*[2]

Allegion moved for summary judgment. On discrimination, Allegion argues that Acosta failed to make out a prima facie case because she has not shown that she was qualified for her position and that she was treated less favorably than similarly situated employees. Doc. 34 at 18–19. And even if she has stated a claim, Allegion argues that it had a legitimate, nondiscriminatory reason for firing her and that she has not shown pretext. *Id.* at 20. On retaliation, Allegion argues that Acosta's claim fails because her managers were unaware of her complaint, the complaint itself was not "protected opposition," and she has not shown that the complaint was a "but for" cause of her discharge. *Id.* at 21–23. As with the discrimination claim, Allegion argues that Acosta cannot prove pretext for its decision to discharge her. *Id.* at 23.

## II

Allegion is entitled to summary judgment on all claims. Acosta has failed to establish a prima facie case of discrimination or retaliation. And even if she had, in either case, she has not offered sufficient evidence that Allegion's reasons for terminating her were pretextual.

### A

Acosta's discrimination claim relies on circumstantial evidence, which, at summary judgment, is viewed through the *McDonnell Douglas* burden-shifting framework.[3] *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under that framework, a plaintiff bears the initial burden of establishing a prima facie case of unlawful discrimination. *Id.* If he or she does so, the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Once the employer advances such a reason, the burden shifts back to the plaintiff to prove that the employer's proffered reason was pretextual. *Id.* Finally, regardless of whether age

---

[2] In Count I of the Complaint, Acosta also alleged a hostile work environment. That claim has been abandoned. Doc. 37 at 18; *see* Doc. 32 at ¶ 4.a.

[3] Acosta does not proceed by direct evidence and agrees that Allegion has cited the proper legal framework for this case. Doc. 37 at 18; *see Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015) ("It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence or by mean of the *McDonnell Douglas* burden-shifting framework.").

was a motivating factor among others, liability depends on a plaintiff establishing that "age was the factor that made a difference." *Jones*, 617 F.3d at 1277–78; *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–78 (2009) (holding the ADEA does not authorize a separate category of "mixed-motives" claims and but-for causation is required).

**1.** Acosta has failed to establish a prima facie case of age discrimination. That requires a plaintiff to show that she was (i) within the protected age group, (ii) qualified for her position, (iii) the subject of an adverse employment action, and (iv) treated less favorably than others not in the protected class. *Jones*, 617 F.3d at 1279. Allegion argues that Acosta cannot satisfy the second or fourth elements.

For the qualification element, the focus is on competence and whether job performance was generally satisfactory. *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1421 (10th Cir. 1991). This does not require showing superiority or flawless performance, but simply work of sufficient quality to merit continued employment. *Id.* Generally, this is a business decision, and a court should not "act as a super personnel department that second guesses employers' business judgments." *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003) (Title VII retaliation); *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 765 (7th Cir. 2001) (ADEA failure to promote); *see also McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) ("[An employee] must prove that he was performing his job at a level which met his employer's legitimate expectations" (citation and internal quotation marks omitted)); *E.E.O.C. v. Wiltel, Inc.*, 81 F.3d 1508, 1515 (10th Cir. 1996) (concluding, in Title VII context, temporary customer service employee who lacked the company's minimum experience requirements and organizational, communication, and interpersonal skills was unqualified for full-time position).

Acosta has not raised a genuine dispute that she was qualified for her job. She argues only generally that she "has adduced evidence in support of her qualification," Doc. 37 at 19–20, without specifying what evidence she relies on for that assertion or how that evidence relates to Allegion's legitimate business expectations. This is insufficient: "[A]n employee's opinion about his or her qualifications does not give rise to a material factual dispute." *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 866 (10th Cir. 2007). Moreover, Allegion has offered evidence that in the two years leading up to her termination,

Acosta had several documented performance issues.[4] She was unfamiliar with essential terms and product information necessary to efficiently resolve customer issues for Allegion's increasingly computerized locks. She had difficulty timely resolving issues and closing out emails. And although Allegion expected all customer service representatives to be able to work all queues, Acosta has not offered evidence indicating that she ever met that requirement. These uncontroverted performance failures, and the record as a whole, indicate that Acosta was not qualified for her role. *See Kelly-Koffi v. Wesley Med. Ctr.*, 241 F. Supp. 2d 1289, 1294 (D. Kan. 2003) (finding plaintiff failed to show qualification as a nurse, in light of uncontroverted evidence of several documentation errors when she was responsible for maintaining accurate health care records).

For the fourth element of a prima facie case—disparate treatment—a plaintiff must show that he or she was treated differently from other similarly situated employees "who violated work rules of comparable seriousness."[5] *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1116–17 (10th Cir. 2007) (quoting *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007)). Similarly situated employees are those who deal with the same supervisor and "are subject to the same

---

[4] Acosta argues that much of Allegion's evidence that she was unqualified is inadmissible hearsay because it is "not admissible at trial in the form" that Allegion presented it at summary judgment. Doc. 37 at 18–20. But Acosta's objection misconstrues the rule. On summary judgment, a party is not required to submit evidence in an admissible form. Rather, the requirement is that the evidence must be *capable* of being offered at trial in an admissible form. *See* Rule 56(c)(2); *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). Specifically, Acosta mentions two facts that Allegion offered in its opening brief, Doc. 34 at ¶¶ 25, 37. One fact is supported by Estrada's sworn affidavit, to which he is prepared to testify at trial. Doc. 34-2. The other relies on a deposition exhibit, the admissibility of which the parties have stipulated. Doc. 32 at ¶ 2.b. (Its underlying facts find further support in affidavits from Estrada and Orosco, Docs. 34-2 & 34-3). Acosta's other objections—that Allegion has only produced argumentative and conclusory statements—are boilerplate and addressed by the Court reviewing the summary judgment record as required under Rule 56.

[5] Some Tenth Circuit termination cases list the fourth element as having been replaced by a younger employee. *E.g.*, *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008); *Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005); *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). Acosta does not argue for that standard, nor does she offer evidence that she was replaced by a younger employee. *See* Doc. 38 at 24 (citing Doc. 37 at 1–27).

standards governing performance evaluation and discipline." *Id.* at 1117 (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). This is ordinarily a fact question for the jury. *Id.* Yet at summary judgment, courts must determine whether the plaintiff "has adduced enough evidence to support a finding that the [other employee] and plaintiff were sufficiently similarly situated to support an inference of discrimination." *Id.* (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 380 (2d Cir. 2003)). Without such evidence, the jury is not entitled to draw an inference of discrimination. *Id.*

Acosta has not identified any other customer service representative who exhibited similar performance issues and required so much training, or who "violated work rules of comparable seriousness." *Riggs*, 497 F.3d at 1116–17. Acosta alleges only that she received more customer calls than the employee near her and that she was the only one required to take a vocabulary test. Doc. 37 at ¶ 4. But these are differences in treatment, not similarities in situation. And to make her prima facie case, Acosta must identify other employees who were similarly situated yet treated differently (more favorably). She has only done the one, so her prima facie case fails. *See Toure v. United Nat. Foods*, No. 12-CV-02790-RM-KLM, 2014 WL 2442962, at *9 (D. Colo. May 30, 2014) ("[A]bsent proper identification of any similarly-situated employees, the Court cannot find that Plaintiff has created a genuine issue of material fact regarding whether he was treated less favorably.").

**2.** Even assuming Acosta could establish a prima facie case of age discrimination, Allegion would still be entitled to summary judgment. Acosta has not raised a genuine issue that Allegion's reason for terminating her was pretextual.

Allegion's reason is simple. It terminated Acosta due to severe and ongoing performance issues, despite significant efforts to help her improve. "Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005); *see also Sanders v. Sw. Bell Tel., L.P.*, 676 F. Supp. 2d 1271, 1282 (N.D. Okla. 2009) ("Emphasizing technical skills is not evidence of age discrimination."). Allegion's rationale suffices.

Having offered a legitimate, nondiscriminatory reason for her termination, Allegion's burden shifts back to Acosta to offer evidence "to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason." *Jones*, 617 F.3d at 1280 (quoting *Bryant*, 432 F.3d at 1125). Evidence of pretext is sufficient when it shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or

9

contradictions" in the employer's reasons that "a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005)). But importantly, courts do not "second guess the business judgment of the employer." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks omitted). That the employer "was mistaken or used poor business judgment" is not sufficient to show that the employer's explanation is unworthy of credibility. *Id.* at 970-71. Thus, a plaintiff must produce evidence that the employer did more than "get it wrong." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). The evidence must indicate that the employer "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Id.*

Acosta has not met this burden. Indeed, her response does not even mention "pretext" in the context of her discrimination claim. *See* Doc. 37 at 1–22. Nor does it otherwise address Allegion's argument that she has not offered sufficient evidence of pretext. Acosta's only reference to pretext appears in relation to her *retaliation* claim. Doc. 37 at 26. That will not do. Failure to address Allegion's argument constitutes a waiver of the point. *See Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1222 (10th Cir. 2017) (upholding district court's grant of summary judgment against plaintiff whose response brief did not address movant's argument).

But even construing her retaliation-pretext argument to apply to her discrimination claim, Acosta still has not raised a genuine dispute "regarding the veracity" of Allegion's reason for terminating her employment. Her argument there relies generally on the "collective evidence adduced by Plaintiff." Doc. 37 at 26. This "collective evidence" appears to be her marginally improving performance and the temporal proximity between her complaint and termination.[6] *Id.* at 25–26. Taken together, these arguments do not raise a genuine issue that Allegion's reasons were pretextual.

---

[6] Acosta also alleged that Allegion "made a negative report" to her prospective employer. Doc. 37 at ¶ 13. Allegion controverts this allegation, Doc. 38 at ¶ III.13, and argues that it is irrelevant to Acosta's claim. In support, Acosta cites her own deposition testimony, Doc. 37 at ¶ 13, but neither party has provided the cited pages to the Court and Allegion has not accepted Acosta's assertion. Because this allegation is neither material under governing law nor supported by the record, it will not be considered.

On performance, some managers noted that Acosta's performance had improved. Doc. 37 at 25–26. But mere improvement does not necessarily indicate satisfactory performance, just as positive past performance does not mean that subsequent negative evaluations are pretextual. *Drury v. BNSF Ry. Co.*, 657 F. App'x 785, 791 (10th Cir. 2016). In other words, "isolated positive feedback" for an employee's fleeting improvement can be "entirely consistent" with an employer's stated reason of poor performance. *Rubinow v. Boehringer Ingelheim Pharms., Inc.*, 496 F. App'x 117, 119 (2d Cir. 2012). And so it was with Acosta. While some managers saw improvement, they also noted continuing failures in several areas, *see* Doc. 34-1 at 180–81, many occurring after Acosta completed the strategies for success program, *see id.* at 60–61. Moreover, the pretext inquiry considers the facts "as they appeared to the decision-makers." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015). The relevant question is whether the employer "honestly believed" its reasons and acted in good faith on those beliefs. *Rivera*, 365 F.3d at 924–25; *see also Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009) ("We are in no position to state that the numerous documented failures by Ms. Pinkerton were not serious enough to justify termination."). Acosta only offers conclusory assertions otherwise.[7]

Ultimately, Acosta has not offered evidence challenging the veracity of Allegion's reason for her termination. For example, she has not alleged any "disturbing procedural irregularity" in her performance reviews or the data used to evaluate her. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002); *Bryant*, 432 F.3d at 1125 (finding sufficient evidence of pretext where plaintiff offered evidence that her performance was not substantially deficient compared to others, evidence that her poor performance was caused by another, and evidence that raised doubts about the accuracy of data used to rate her performance). Nor has she shown that Allegion's decision was so infused with subjectivity as to suggest pretext. *See Riggs*, 497 F.3d at 1120. And while she alleges that Estrada and Orosco only documented the vocabulary test assignment eight days after her complaint and that

---

[7] Continuing to construe Acosta's retaliation-pretext argument to her discrimination claim does not help. There, she argues temporal proximity. Doc. 37 at 25–26. But temporal proximity alone is not sufficient to show pretext and defeat summary judgment because it does not show "weaknesses, implausibilities, or inconsistencies" in an employer's stated reasons. *Pinkerton*, 563 F.3d at 1065–66. Put simply, Acosta's conclusory references to the "collective evidence adduced," Doc. 37 at 25–26, add nothing to mix with her temporal proximity argument.

Orosco's statement that the practice should be standard for all employees raises an inference of an attempt "to cover up an act of age discrimination against Plaintiff," Doc. 37 at 21, neither call into question the *veracity* of Allegion's reason—that Acosta was a poor performer and needed extra training to learn the essential terms of her job and to keep up in the queues. Thus, unable to show pretext, Acosta has not raised a genuine dispute that her age was a but-for cause of her termination.

## B

Acosta's retaliation claim fails for similar reasons. As with the discrimination claim, Allegion challenges Acosta's prima facie showing and makes the pretext argument already analyzed in Part II.A.2, *supra*. Allegion also specifically argues that Acosta has not offered sufficient evidence to support her ultimate burden of but-for causation. *Cf. Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349–52 (2013) (citing *Gross*, 557 U.S. at 176) (Title VII retaliation).

**1.** A prima facie case of retaliation requires the plaintiff to show that (i) he or she engaged in protected opposition to discrimination, (ii) suffered a materially adverse employment action, and (iii) there is a causal connection between the protected activity and the adverse action. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008). For the first element, "no magic words are required," but to qualify as protected opposition the employee "must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the ADEA." *Hinds*, 523 F.3d at 1203. The third element requires showing that the employer was "motivated . . . by a desire to retaliate" for the protected activity. *Id.* Naturally, as a prerequisite, a plaintiff must show that "those who decided to fire him had knowledge of his protected activity." *Id.*

Allegion makes three arguments against Acosta's prima facie case. Two fail because Acosta has offered sufficient evidence to raise a genuine dispute: that the relevant decision makers were aware of Acosta's internal complaint and that the complaint constituted protected opposition. The complaint investigator spoke with both managers about the complaint, which was fairly understood as an attempt to report discrimination, and counseled them to avoid similar issues in the future.

Still, Allegion prevails on its third argument—that Acosta's reliance on temporal proximity alone is insufficient to show a causal connection between her protected activity (the March complaint) and the

12

adverse action (the July termination).[8] In establishing a prima facie case, as opposed to showing pretext, temporal proximity *can* be enough to satisfy the causation element when the connection is sufficiently close. *Cf. Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (Title VII). But unless the adverse action is "very closely connected in time" to the protected activity, a plaintiff must rely on additional evidence to establish causation. *Id.* (brackets and emphasis omitted) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). Six weeks may be sufficient, but the Tenth Circuit has held that three months is too long, standing alone, to show causation. *Id.* Because four months passed between Acosta's complaint and her termination, she cannot rely on temporal proximity alone, and her prima facie case fails for lack of additional evidence of causal connection.

**2.** Even assuming that Acosta could establish a prima facie case, Allegion would still be entitled to summary judgment because Acosta has failed to offer sufficient evidence of pretext or that her complaint was the but-for cause of her termination. Acosta's pretext argument fails for the reasons in Part II.A.2, *supra*. As for the but-for causation requirement, Acosta's response does not address it, relying again on general, conclusory statements about "collected evidence adduced." *See* Doc. 37 at 25–26. Thus, in light of Acosta's performance issues and lack of evidence that she would not have been terminated but for her complaint, Allegion is entitled to summary judgment on the retaliation claim.

### III

For the reasons set forth above, Allegion's motion for summary judgment, Doc. 33, is GRANTED.

It is so ordered.

Date: March 11, 2022                     s/Toby Crouse
                                         Toby Crouse
                                         United States District Judge

---

[8] The "adverse action" is Acosta's termination, not placement in a performance improvement plan as she implies, Doc. 37 at 25–26. *Cf. Payan v. United Parcel Serv.*, 905 F.3d 1162, 1174 (10th Cir. 2018) ("[P]lacement on an employee improvement plan alone does not qualify as a materially adverse action.") (Title VII).